IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-CV-442-D

| | | |
|---|---|---|
| MARIA NICOLE DURDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

On August 11, 2011, Maria Nicole Durden ("Durden" or "plaintiff") filed a complaint against the United States ("government" or "defendant") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 et seq. [D.E. 1]. Durden's FTCA claim arises from a sexual assault that United States Army Specialist Aaron Pernell committed against Durden on December 13, 2009, on Fort Bragg, North Carolina. On January 12, 2012, the government filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6), and a supporting memorandum [D.E. 13, 14]. The government also submitted declarations and other materials to support its motion [D.E. 15, 16]. On February 21, 2012, Durden filed a response in opposition to the motion to dismiss [D.E. 18]. On March 19, 2012, the government filed a reply [D.E. 20]. As explained below, the court grants the government's motion to dismiss under Rule 12(b)(1).

I.

Aaron Pernell ("Pernell") enlisted in the United States Army when he was eighteen years old. See Compl. [D.E. 1], Ex. 2 ("Pernell Aff.") ¶ 3. The Army deployed Pernell to Iraq shortly after he completed boot camp and airborne training. Id. ¶ 4. During Pernell's time in Iraq, he "was exposed to many things." Id. ¶ 5. At the end of Pernell's deployment, the Army assigned Pernell to

Headquarters Company, 1st Battalion, 325th Airborne Infantry Regiment at Fort Bragg. See Wiltse Decl. [D.E. 16] ¶¶ 1, 3. Pernell states that his combat experiences caused him to have "recurring nightmares." Pernell Aff. ¶ 6. Pernell did not seek psychological treatment for these nightmares, and instead abused alcohol and illegal drugs to self medicate. Id. ¶ 7.

According to Pernell, "[b]y 2009, [he] was not able to keep it together anymore." Id. ¶ 8. Thus, Pernell "began trying to get help from the military." Id. Pernell's means of seeking treatment were unconventional and ineffective. In March 2009, Pernell told a staff sergeant that he desired to kill eleven current or former members of his unit and himself. Id. Pernell made this statement because he expected that his doing so would "automatically trigger [his] commitment to a mental health facility." Id. However, contrary to Pernell's expectation, the staff sergeant told Pernell not to seek mental health treatment and that such treatment would "mess up [his] military career." Id.; see Compl. ¶ 5. In August 2009, Pernell again expressed to the staff sergeant his desires to kill the same eleven current or former comrades and himself, and again the staff sergeant discouraged Pernell from seeking mental health treatment. Pernell Aff. ¶ 8; see Compl. ¶ 6. In September 2009, Pernell told another soldier of Pernell's substance abuse and admitted that he "needed help." Pernell Aff. ¶ 8; see Compl. ¶ 7. Like the staff sergeant, the soldier warned Pernell that seeking mental health treatment would "mess up [Pernell's] career." Pernell Aff. ¶ 8; see Compl. ¶ 7.

Despite Pernell's statements and substance abuse, Pernell's service record was mostly unblemished until September 10, 2009. According to Army Captain James C. Wiltse ("Wiltse"), who commanded Pernell's company when Pernell was stationed at Fort Bragg, the only misconduct that Pernell engaged in before September 10, 2009, was missing work and consuming alcohol while underage. Wiltse Decl. ¶¶ 3–4. However, on September 10, 2009, Pernell burglarized a home in Fayetteville, North Carolina and assaulted the home's occupants by pointing a gun at them. Compl.

2

¶ 8. Local civilian law enforcement officials arrested Pernell and a North Carolina prosecutor filed criminal charges against him. See id. Pernell was detained at the Cumberland County, North Carolina Jail from September 11, 2009, until October 22, 2009. Compl. ¶ 10. On October 22, 2009, Pernell's platoon leader traveled to the Cumberland County Jail to retrieve Pernell and take him to Fort Bragg. Pernell Aff. ¶ 9; see Wiltse Decl. ¶ 5. As the platoon leader drove Pernell to Fort Bragg, Pernell again expressed his desire to kill eleven fellow soldiers and himself. Pernell Aff. ¶ 9; see Compl. ¶ 12. That day, Wiltse first learned about Pernell's threats and questioned Pernell about them. Wiltse Decl. ¶ 10. According to Wiltse, Pernell admitted only to making the threats "months before his arrest for burglary" and Pernell stated that "at the current time he did not intend to harm himself or others." Id.

The parties dispute how the Army treated Pernell after Pernell returned to Fort Bragg. Based on Pernell's affidavit, Durden contends that, on October 22, 2009, Wiltse "issued an order . . . to . . . Pernell's platoon[] that . . . Pernell must have a noncommissioned officer [("NCO")] escort at all times and that [Pernell's] Charge of Quarters [("CQ")] should check every hour to make sure . . . Pernell was confined to his barracks." Compl. ¶ 13; see Pernell Aff. ¶ 10 ("I was ordered to stay on post and to always have an NCO . . . escort me at all times while on post."). According to Pernell, "[t]hese orders were not followed." Pernell Aff. ¶ 11. Pernell states that, within approximately one day of his return to Fort Bragg, he "was able to walk out the front door [of his barracks] again and be gone all night without anyone saying a word." Id.; see Compl. ¶ 15. According to Pernell, although during working hours he was escorted to and from appointments, "[a]fter hours[,] [he] was completely on [his] own, with no escort." Pernell Aff. ¶ 11. Moreover, Pernell states that his "chain of command knew [he] was still going out . . . every night." Id.

3

Wiltse denies imposing such severe restrictions on Pernell. See Wiltse Decl. ¶¶ 6–7. Wiltse states that when Pernell was released from the Cumberland County Jail, Wiltse "advised [Pernell] that he was to remain on Fort Bragg, and that if he wanted to leave Fort Bragg, he was first required to obtain permission . . . . [and] that after he received permission, he was required to be escorted by a [NCO] . . . whenever he left Fort Bragg." Id. ¶ 6; see id., Ex. 1 ("October 22, 2009 Counseling Form") ("Understand this revocation of privelages [sic] does not allow you the ability to leave the Fort Bragg Installation."). Wiltse states that he "wanted to place stricter restrictions on . . . Pernell's liberty . . . . [but] was advised [by the brigade's legal office] that further restrictions were not advisable and would, under the circumstances, be tantamount to confinement under the Uniform Code of Military Justice [("UCMJ")] . . . . [and] would violate . . . Pernell's rights." Wiltse Decl. ¶ 7. Thus, Wiltse "did not require . . . Pernell to be escorted as long as he remained on . . . Fort Bragg." Id. ¶ 8. Consistent with Pernell's statement, Wiltse notes that "an escort was assigned to take . . . Pernell to his scheduled appointments during the duty day." Id. Wiltse also states that he "did decide initially that the unit personnel working as [CQ] . . . would check on . . . Pernell when he was physically in his barracks room every two hours during the evening." Id. ¶ 9. However, Wiltse states that he concluded shortly thereafter that this measure was unnecessary. Id.

Regardless of the restrictions that the Army imposed on Pernell, Wiltse and Major Jennifer L. Venghaus ("Venghaus"), an active-duty lawyer who served as the Chief of Criminal Law for the 82d Airborne Division at Fort Bragg during 2009, each state that, upon Pernell's return to Fort Bragg from the Cumberland County Jail, the Army began the process of administratively separating Pernell from the Army. Venghaus Decl. [D.E. 15] ¶ 7; Wiltse Decl. ¶ 11. As a part of this process, on October 30, 2009, Pernell underwent a mental health evaluation. Venghaus Decl. ¶ 7; Wiltse Decl. ¶ 11. The evaluator determined that Pernell was mentally responsible, that Pernell did not need

4

mental health treatment, and that it was unlikely that Pernell would harm himself or others. See Venghaus Decl., Ex. 2 ("October 30, 2009 Mental Health Evaluation") 1–2. The evaluator cleared Pernell for administrative separation. Id. 2; see Venghaus Decl. ¶ 7; Wiltse Decl. ¶ 11. The evaluator's findings caused Wiltse to discontinue his order regarding routine observations of Pernell by Pernell's CQ. Wiltse Decl. ¶ 12.

The parties also dispute the Army's motives for imposing restrictions on Pernell. Durden contends that the Army imposed restrictions "to make sure that . . . Pernell would not cause harm to others." Compl. ¶ 13. However, Wiltse states that he imposed restrictions on Pernell solely "as a means to protect . . . Pernell from himself." Wiltse Decl. ¶ 9. Venghaus states that Wiltse also restricted Pernell's ability to leave Fort Bragg "in order to ensure that [Pernell] was available for administrative [separation] proceedings and did not go absent without leave." Venghaus Decl. ¶ 6. Wiltse and Venghaus did not suggest that the Army imposed restrictions to protect Pernell from assaulting others.

On December 13, 2009, while inebriated, Pernell entered Durden's home on Fort Bragg and forced Durden to engage in sexual intercourse with him. See Compl. ¶ 16; Pernell Aff. ¶ 11. Pernell coerced Durden by threatening to kill Durden and her children if she did not comply with his demands. Compl. ¶ 16.

In January 2010, Pernell became a suspect in the investigation of the sexual assault on Durden. Venghaus Decl. ¶ 8. Around January 14, 2010, Pernell asked the Army for mental health treatment, which he received. Id. ¶ 9. After treating Pernell, an Army staff psychiatrist found that Pernell posed a "med[ium] risk for harmful behavior to himself or others." Id., Ex. 3 ("January 14, 2010 Memorandum"). The staff psychiatrist recommended that Pernell be placed on limited watch, meaning that Pernell's activities be monitored and that Pernell be required to sleep where he could

5

be readily observed. Venghaus Decl., Ex. 4 ("January 14, 2010 Unit Watch Guidance"). Venghaus states that Pernell was then "immediately placed on unit watch." Venghaus Decl. ¶ 9; see id. Ex. 5 ("January 14, 2010 Counseling Form") 1–2 ("Effective immediately, you are to be placed on Unit Watch . . . ."). On January 28, 2010, the Army criminal investigators received laboratory test results that identified Pernell as Durden's assailant. Venghaus Decl. ¶ 10. The investigators then apprehended and detained Pernell. Id.; see id., Ex. 6 ("Confinement Order").[1] After apprehending Pernell, the investigators identified Pernell as a suspect in other burglaries and sexual assaults that occurred in and around Fayetteville, North Carolina between 2008 and 2009. Venghaus Decl. ¶ 11. According to Venghaus, before January 28, 2010, the Army had no information that suggested that Pernell was involved in crimes other than the September 10, 2009 burglary. Id.

On December 8, 2010, Pernell was convicted at a general court-martial of sexually assaulting Durden. Id. ¶ 12; see id., Ex. 7 ("Result of Trial") 1. As punishment, Pernell was reduced in rank, ordered to forfeit all pay and allowances, ordered to be confined for fifty years, and ordered to be dishonorably discharged. Result of Trial 1.

Durden alleges that the government, through the Army, was negligent, that the government's negligence caused her to incur damages, and that she is entitled to recover money under the FTCA. See Compl. ¶¶ 17–25. The government contends that the court lacks subject matter jurisdiction, and thus moves to dismiss under Rule 12(b)(1). See Def.'s Mot. Dismiss 1; see also Def.'s Mem. Supp. Mot. Dismiss [D.E. 14] 10–20. Alternatively, the government contends that Durden has failed to state a claim upon which relief can be granted.

---

[1] The confinement order is erroneously dated January 28, 2009. See Confinement Order 1.

II.

Subject matter jurisdiction is the court's "statutory or constitutional power to adjudicate the case." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) (emphasis omitted). The court "must determine that it has subject[]matter jurisdiction over [a claim] before it can pass on the merits of that [claim]." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 479–80 (4th Cir. 2005). Durden has the burden of establishing that the court has subject matter jurisdiction. See, e.g., Steel Co., 523 U.S. at 104; Richmond, Fredericksburg & Potomac R.R. v. United States, 945 F.2d 765, 768 (4th Cir. 1991).

There are two ways that the court may conclude that it lacks subject matter jurisdiction. See Lovern v. Edwards, 190 F.3d 648, 654 (4th Cir. 1999). "The court may find insufficient allegations in the pleadings, viewing the alleged facts in the light most favorable to the plaintiff, similar to an evaluation pursuant to Rule 12(b)(6). Alternatively, after an evidentiary hearing, the court may weigh the evidence in determining whether the facts support the jurisdictional allegations." Id. (citations omitted). Thus, a motion under Rule 12(b)(1) permits "[a] trial court [to] consider evidence by affidavit, depositions or live testimony without converting the proceeding to one for summary judgment." Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982); see Suter v. United States, 441 F.3d 306, 309 n.2 (4th Cir. 2006). When the court weighs the evidence as to facts relevant to subject matter jurisdiction, "the presumption of truthfulness normally accorded a complaint's allegations does not apply, and the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009). Here, neither party has requested an evidentiary hearing, but has submitted affidavits relevant to subject matter jurisdiction. Thus, the court considers those materials in resolving the dispute about subject matter jurisdiction.

7

Durden sues the government under the FTCA. See Compl. ¶ 3. "Absent a waiver, sovereign immunity shields the [f]ederal [g]overnment and its agencies from suit." FDIC v. Meyer, 510 U.S. 471, 475 (1994); see Kerns, 585 F.3d at 193–94. "Sovereign immunity is jurisdictional in nature." Meyer, 510 U.S. at 475. Thus, when sovereign immunity prevents a plaintiff from recovering, a court lacks subject matter jurisdiction to hear the plaintiff's claim. See id.; see also Bullock v. Napolitano, 666 F.3d 281, 284 (4th Cir. 2012) ("Sovereign immunity is not only a bar to liability but also a bar to the courts in which suits against the United States can be filed . . . ."). When it enacted the FTCA, Congress "waived the sovereign immunity of the United States for certain torts committed by federal employees." Meyer, 510 U.S. at 476. Thus, while the court has subject matter jurisdiction to hear claims against the government that meet the criteria set forth in the FTCA, sovereign immunity precludes the court's having subject matter jurisdiction over claims against the government that do not meet those criteria. See United States v. Orleans, 425 U.S. 807, 813–14 (1976). Cognizable claims under the FTCA are claims

> [1] against the United States, [2] for money damages, [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the [g]overnment [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Meyer, 510 U.S. at 477 (quotation and alteration omitted); see 28 U.S.C. § 1346(b).[2]

A claim may satisfy these requirements and nevertheless not be cognizable under the FTCA and thus be barred by sovereign immunity. See Sheridan v. United States, 487 U.S. 392, 398 (1988).

---

[2] Additionally, before bringing a claim under the FTCA, a plaintiff must present an administrative claim to the appropriate government agency. See 28 U.S.C. § 2675(a). The parties agree that Durden presented such a claim to the Army and that, on March 7, 2011, the Army denied Durden's claim. See Compl. ¶ 3; see also id., Ex. 1 ("Denial of Claim").

8

For example, the FTCA's waiver of sovereign immunity does not apply to "[a]ny claim arising out of assault, [or] battery" even if the claim otherwise satisfies the FTCA's jurisdictional criteria. 28 U.S.C. § 2680(h). Although the statutory language in section 2680(h) creating this exception is broad, "it is . . . undisputed that in at least some situations the fact that an injury was directly caused by an assault or battery will not preclude liability against the [g]overnment for negligently allowing the assault to occur." Sheridan, 487 U.S. at 398.

In Sheridan, plaintiffs were injured when an off-duty employee of a United States Navy hospital became intoxicated and fired his rifle at plaintiffs. Id. at 395. Before the shooting, the assailant's co-workers found the assailant "lying face down in a drunken stupor on the concrete floor of a hospital building." Id. The co-workers attempted to take the assailant to the hospital's emergency room, however, the assailant resisted and retrieved a rifle that he was carrying in a bag. Id. When the co-workers saw the rifle, they fled and "neither took further action to subdue [the assailant], nor alerted the appropriate authorities that he was heavily intoxicated and brandishing a weapon." Id. Shortly thereafter, the assailant fired shots at plaintiffs. Id.

Plaintiffs sued the government under the FTCA, arguing that the co-workers negligently failed to eliminate an obvious risk, and that the government was liable for the co-workers' negligence under the FTCA, even if the government was not liable for the assailant's intentional act. Id. Plaintiffs alleged that the government voluntarily assumed a duty of protecting plaintiffs by enacting regulations requiring government employees to report individuals who were carrying weapons at the hospital and initially aiding (through the government employees) the drunken, armed assailant. See id. at 395, 401. Plaintiffs further alleged that the government's negligence resulted in a breach of this duty. Id. at 395.

9

The Supreme Court held that the FTCA did not bar a claim under plaintiff's theory of negligence. See id. at 403. The Court first acknowledged that the FTCA's intentional tort exception precludes all claims against the government "arising out of" a government employee's intentional tort that was the actual cause of the plaintiff's injury. Id. at 398 (quoting 28 U.S.C. § 2680(h)). The Court then recognized that plaintiffs' negligence claim fell outside the intentional tort exception because it was "entirely independent of [the assailant's] employment status." Sheridan, 487 U.S. at 401. The Court reasoned that "the mere fact that [the assailant] happened to be an off-duty federal employee should not provide a basis for protecting the [g]overnment from liability that would attach if [the assailant] had been an unemployed civilian patient or visitor to the hospital." Id. at 402.[3]

In analyzing section 2680(h), courts focus on whether the government would be liable for its employee's negligence if the employee who committed an intentional tort that caused the plaintiff's injury was not a government employee. See Sheridan, 487 U.S. at 402–03; Bajkowski v. United States, 787 F. Supp. 539, 541 (E.D.N.C. 1991). Liability for negligence may be predicated upon the government's voluntary assumption of a duty. See Rogers v. United States, 397 F.2d 12, 14 (4th Cir. 1968) ("When an agency of the United States voluntarily undertakes a task, it can be held to have accepted the duty of performing that task with due care."). Thus, "where the government affirmatively assumes a duty to protect a person prior to and independent of any assault, and where an alleged breach . . . leads to an assault . . . , whether or not by a government employee, the claim arises out of the government's negligence, and [section] 2680(h) does not bar the [claim]."

_____

[3] In Sheridan, the Supreme Court assumed without deciding that the government's actions did constitute negligence under Maryland law, the law of the state where the claim arose. See Sheridan, 487 U.S. at 401 & n.6; see also 28 U.S.C. § 1346(b)(1). On remand, though, the Fourth Circuit concluded that plaintiffs' allegations did not support a negligence claim under Maryland law. Sheridan v. United States (Sheridan II), 969 F.2d 72, 74 (4th Cir. 1992).

Doe v. United States, 838 F.2d 220, 225 (7th Cir. 1988); see Lilly v. United States, 141 F. Supp. 2d 626, 629 (S.D. W. Va. 2001).

Under the FTCA, courts look to state law "where the act or omission occurred" to determine the existence and parameters of a duty. 28 U.S.C. § 1346(b)(1); see Bodin v. Vagshenian, 462 F.3d 481, 489 (5th Cir. 2006) (noting that state law determines "[w]hether the [government] owed an independent duty to [a] plaintiff[]"); LM ex rel. KM v. United States, 344 F.3d 695, 700 (7th Cir. 2003). Here, the events alleged in the complaint occurred in North Carolina. Thus, North Carolina law determines whether the government breached a duty that it owed to Durden that existed before December 13, 2009, and that was independent of the government's employment of Pernell. See 28 U.S.C. § 1346(b)(1).

Durden alleges that the government owed three duties to her, that each of these duties existed before December 13, 2009, and that each was independent of the government's employment of Pernell. Durden also contends that the government breached each of these duties by creating circumstances that allowed Pernell to commit the assault on December 13, 2009. See Compl. ¶ 24; see also Pl.'s Mem. Opp'n Mot. Dismiss 5–8. The court examines Durden's arguments seriatim.[4]

A.

Durden first contends that the government breached a duty that it owed to all civilian residents of Fort Bragg to protect such residents from known risks of harm, specifically "persons . . . who had a known propensity to commit violent and assaultive acts." Compl. ¶ 24(a); see Pl.'s Mem. Opp'n Mot. Dismiss 6–7 ("The gravamen of [p]laintiff's complaint is that the [g]overnment,

---

[4] Durden also alleges that the government "breached its duties to supervise . . . Pernell." Compl. ¶ 22. To the extent that Durden asserts a claim alleging that the government negligently supervised Pernell, and that the government's negligence caused her injury, the court lacks subject matter jurisdiction over such a claim. See, e.g., Suter, 441 F.3d at 312 n.6.

11

under the circumstances, violated its responsibility to provide . . . [p]laintiff and her children with a safe place to live."). Durden reasons that as a civilian resident of Fort Bragg, her relationship to the government was that of a tenant to a landlord. See Pl.'s Mem. Opp'n Mot. Dismiss 6–8. Thus, Durden contends that the government did not fulfill the duties that North Carolina law imposes on a landlord to protect its tenant from harm. See id.

Under North Carolina law, "a landlord owes a duty to [a tenant] to use reasonable care to keep the premises safe and to warn of hidden dangers." Prince v. Wright, 141 N.C. App. 262, 271, 541 S.E.2d 191, 198 (2000) (emphasis and alteration omitted). However, a landlord "is not an insurer of [a tenant's] safety." Id., 541 S.E.2d at 198; see Waltz v. Wake Cnty. Bd. of Educ., 104 N.C. App. 302, 304, 409 S.E.2d 106, 107 (1991). Instead, a landlord only breaches its duty to a tenant when the landlord fails to act "as a reasonable person would under the circumstances." Nelson v. Freeland, 349 N.C. 615, 632, 507 S.E.2d 882, 892 (1998).

A landlord fails to act as a reasonable person under similar circumstances when the landlord fails "to exercise reasonable care to protect [its] tenants from third-party criminal acts that occur on the premises if such acts are foreseeable." Davenport v. D.M. Rental Props., Inc., 718 S.E.2d 188, 189–90 (N.C. Ct. App. 2011); see Foster v. Winston-Salem Joint Venture, 303 N.C. 636, 638–39, 281 S.E.2d 36, 38 (1981); Shepard v. Drucker & Falk, 63 N.C. App. 667, 669, 306 S.E.2d 199, 201 (1983). To prove that the criminal acts of third parties were foreseeable to a landlord, a plaintiff-tenant "need only show that in the exercise of reasonable care the [landlord] should have foreseen that some injury would result from his act or omission." Foster, 303 N.C. at 642, 281 S.E.2d at 40. However, the North Carolina courts have yet to hold that a landlord's duty to protect its tenant from foreseeable criminal acts of third parties includes a duty to evict a third-party tenant. See Davenport, 718 S.E.2d at 191–92.

12

In Davenport, plaintiff-tenant of a mobile home park incurred injuries after another tenant, while intoxicated, assaulted plaintiff. Id. at 189. Plaintiff-tenant sued defendants-owner of the mobile home park, asserting that defendants failed to perform their duty of protecting plaintiff from the foreseeable criminal acts of third parties by, among other things, failing to evict the assailant despite knowing that the assailant had previously committed criminal acts at the mobile home park. Id. at 191. The North Carolina Court of Appeals rejected this argument, holding that although "the evidence of [the assailant's] prior conduct" at the mobile home park "did not portray [the assailant] as a model tenant, . . . [it] did not indicate a propensity for violence at the level of his attack on [plaintiff]." Id. In support, the North Carolina Court of Appeals cited the cordial relationship that existed between plaintiff and the assailant before the attack and that the assailant's intoxication contributed to the attack. Id. Thus, based on these facts, the North Carolina Court of Appeals declined to extend a landlord's duty to protect to include evicting a tenant that the landlord knows has a tendency to commit criminal acts. See id.

Here, before December 13, 2009, North Carolina law imposed a duty on the government, as Durden's landlord, to protect Durden from foreseeable criminal acts of third parties. See Davenport, 718 S.E.2d at 189–90. Thus, Durden satisfies the subject matter jurisdiction requirement that the government owed her a duty before the intentional tort was committed. See Doe, 838 F.2d at 225. However, the court only has subject matter jurisdiction if the government breached the duty that it owed to Durden in a way that was independent of Pernell's employment status. See, e.g., Lilly, 141 F. Supp. 2d at 629. Durden's alleged facts do not establish that the government breached a duty that it owed to her. As in Davenport, Durden essentially argues that the government knew of Pernell's tendency to commit criminal acts, and was thereby negligent in failing to restrain Pernell from doing so. See Pl.'s Mem. Opp'n Mot. Dismiss 7; see Davenport, 718 S.E.2d at 191. However, in

13

Davenport, the North Carolina Court of Appeals made clear that it is only when the landlord observed the third-party tenant commit "relevant prior criminal acts" on the leased premises that the landlord might be required to evict the third-party tenant as part of its duty of protecting the tenant from the third parties' foreseeable criminal acts. Davenport, 718 S.E.2d at 191.

Durden does not allege that, before December 13, 2009, the government knew of relevant, previous criminal acts that Pernell committed on Fort Bragg. Rather, Durden alleges that the government knew that Pernell illegally abused alcohol and drugs on Fort Bragg. See Compl. ¶ 7. However, such "prior criminal acts" were not "relevant" to Pernell's assault of Durden before December 13, 2009. See Davenport, 718 S.E.2d at 191–92. Additionally, Durden alleges that the government knew that Pernell committed an assault by pointing a gun and a burglary in Fayetteville on September 10, 2009. See Compl. ¶ 8. Assuming that these acts could be considered relevant to Pernell's sexual assault of Durden, they were not committed "on the premises" of Fort Bragg. See Davenport, 718 S.E.2d at 191. Thus, Pernell's September 10, 2009, criminal acts do not provide a basis for holding that Pernell's December 13, 2009 criminal acts on Fort Bragg were foreseeable to the government before December 13, 2009. See id. at 191–92. Finally, Durden alleges that Pernell's statements to government employees expressing his desire to commit violent acts against fellow soldiers made Pernell's assaulting Durden foreseeable to the government before December 13, 2009. See Compl. ¶¶ 5–7, 12. However, Pernell's statements did not concern relevant criminal acts on Fort Bragg. Thus, under North Carolina law, Durden's first theory under the FTCA fails.

Alternatively, even if the government's knowledge of Pernell's tendency to commit criminal acts made Pernell's assaulting Durden foreseeable to the government before December 13, 2009, section 2680(h) still negates the court's subject matter jurisdiction. After all, the government only acquired such knowledge in the course of Pernell's employment. In Bajkowski, which involved facts

14

very similar to this case except that the alleged assault occurred at plaintiff's off-base residence, the court held that it lacked subject matter jurisdiction, in part, because, had the assailant not been a government employee, "the [government] would not have had . . . knowledge of his prior . . . assaultive behavior." Bajkowski, 787 F. Supp. at 541–42. Thus, because the government's knowledge of the assailant's tendency to commit criminal acts stemmed solely from the assailant's government employment, the government's breach of any duty owed to plaintiff was not independent of the employment relationship. See id.; see also Acosta v. United States, 207 F. Supp. 2d 1365, 1369 (S.D. Fla. 2001) (determining that section 2680(h) barred the court's subject matter jurisdiction because the assailant's "allegedly foreseeable battery was only foreseeable to the [government] because it happened to be the assailant's employer").

In sum, Durden may not avoid the FTCA's jurisdictional bar by recasting her claim as one rooted in premises liability, where the foreseeability element is based entirely on the government's having been Pernell's employer. Accordingly, to the extent that Durden relies on premises liability to assert a negligence claim against the government, the court lacks subject matter jurisdiction over such a claim.

### B.

Next, Durden argues that the special relationship between the government and Pernell created a duty, under North Carolina law, on the government to protect others (including her) from Pernell. Compl. ¶ 24(b); see Pl's Mem. Opp'n Mot. Dismiss 7–8. Under North Carolina law, "there is no duty to protect others against harm from third persons." King v. Durham Cnty. Mental Health Developmental Disabilities & Substance Abuse Auth., 113 N.C. App. 341, 345, 439 S.E.2d 771, 774 (1994) (quotation omitted); see Thornton v. F.J. Cherry Hosp., 183 N.C. App. 177, 186, 644 S.E.2d 369, 376 (2007); Hall v. Toreros, II, Inc., 176 N.C. App. 309, 325, 626 S.E.2d 861, 872 (2006).

However, this general rule does not apply "when a special relationship exists" between an actor and a third party. King, 113 N.C. App. at 345, 439 S.E.2d at 774. A special relationship between an actor and a third party exists when the actor has "the ability to control" the third party and has "knowledge of the [third party's] propensity for violence." King, 113 N.C. App. at 346, 439 S.E.2d at 774 (quotation omitted); see Hedrick v. Rains, 121 N.C. App. 466, 469, 466 S.E.2d 281, 284 (1996). When a special relationship exists, "there is a duty upon the actor to control the third person's conduct . . . and to guard other persons against his dangerous propensities." King, 113 N.C. App. at 345–46, 439 S.E.2d at 774 (quotation omitted).

Durden alleges that the government had knowledge of Pernell's tendency to commit violent acts before December 13, 2009. See Compl. ¶ 20. In support, Durden cites Pernell's statements to government employees expressing his desires to commit violent acts against fellow soldiers in his unit. See Pl.'s Mem. Opp'n Mot. Dismiss 7; see also Compl. ¶¶ 5–7, 12; Pernell Aff. ¶¶ 8–9. Durden also cites Pernell's conduct on September 10, 2009, as giving the government knowledge that Pernell was likely to commit additional violent acts on Fort Bragg. See Pl.'s Mem. Opp'n Mot. Dismiss 3–4; see also Compl. ¶¶ 8, 10; Pernell Aff. ¶¶ 9–10.

Although the government acknowledges that its agents knew before December 13, 2009, of Durden's comments concerning members of his unit, the government denies that it had "prior knowledge of the nature and extent of . . . Pernell's violent tendencies." Def.'s Mem. Supp. Mot. Dismiss 3–4. In support, the government notes that Pernell's arrest on September 10, 2009, was the only indicator that it had, before December 13, 2009, that Pernell was likely to commit a violent act. Id. 4. The government then offers two explanations for why Pernell's September 10, 2009 arrest did not give the government knowledge that Pernell was likely to commit additional violent acts against others (including Durden on Fort Bragg). First, North Carolina "authorities released . . . Pernell on

16

bail, indicating that they did not view . . . Pernell as a serious threat to the community." Id. Second, although North Carolina authorities charged Pernell with assault, "the assault occurred when [Pernell] brandished a weapon (pellet gun) at the victim and did not include any physical contact between . . . Pernell and the victim." Id. 4 n.1. Furthermore, the government contends that, to the extent that Pernell's statements or conduct suggested that Pernell was likely to commit violent acts, the mental health evaluator's October 30, 2009 determination that Pernell did not exhibit "any emotional or mental disorders or any substantial risk of self-harm or harm to others" justifiably caused the government to discount such a suggestion. Id. 4; see October 30, 2009 Mental Health Evaluation. As for Pernell's comments about harming himself or members of his unit, Pernell disavowed his desires to commit violent acts on October 22, 2009. See Wiltse Decl. ¶ 10.

        Here, the evidence demonstrates that, before December 13, 2009, the government did not have knowledge of Pernell's tendency to commit violent acts to give rise to a duty to protect others from Pernell. The knowledge component of the special-relationship duty can be satisfied when a third party's tendency to commit violent acts caused the third party to be in the actor's custody, see, e.g., Davis v. N.C. Dep't of Human Res., 121 N.C. App. 105, 113, 465 S.E.2d 2, 7 (1995), or caused the actor to provide mental health treatment to the third party. See, e.g., King, 113 N.C. App. at 346, 439 S.E.2d at 775. Even accepting as true Durden's allegations regarding the ways that the government restricted Pernell after Pernell returned to Fort Bragg following his September 10, 2009 arrest, Pernell's tendency to commit violent acts did not cause Pernell to be in the government's custody. Rather, Pernell was in the government's custody because the Army was concerned that Pernell might become absent without leave during the process of discharging him from the Army. See Venghaus Decl. ¶ 6. An actor's merely having custody over a third party, when such custody is unrelated to the third party's tendency to commit violent acts, is insufficient to impute knowledge

17

to the actor of the third party's tendency to commit violent acts. See Hedrick, 121 N.C. App. at 469–70, 466 S.E.2d at 284 (defendant-sheriff's having detained third party-former county jail inmate for a probation or parole violation did not give defendant knowledge of third party's tendency to commit violent acts). Additionally, although the government evaluated Pernell's mental health on October 30, 2009, the government did not provide Pernell with mental health treatment before December 13, 2009. Furthermore, Pernell's statements expressing a desire to perform specific violent acts against members of his unit did not give the government knowledge of Pernell's desire to perform an entirely different violent act against Durden (or anyone else). Cf. Moore v. Crumpton, 306 N.C. 618, 627, 295 S.E.2d 436, 442 (1982) (declining to create liability where, although parents knew their son previously had committed an assault with a deadly weapon, "they had no recent information to indicate that another assault might occur or that [he] might become involved in a forcible rape"). Finally, even if these statements did suggest to the government that Pernell might commit a violent act like the one that he committed on December 13, 2009, the government justifiably disregarded Pernell's statements after Pernell disavowed them and the mental health evaluation corroborated Pernell's disavowal.

Durden also alleges that the government had the capacity to control Pernell before December 13, 2009, thus satisfying the second requirement for the existence of a special relationship between the government and Pernell. Compl. ¶¶ 18–20; see Pl.'s Mem. Opp'n Mot. Dismiss 7–8. In support, Durden contends that the government, acting through Wiltse, issued valid orders preventing Pernell from leaving Fort Bragg without authorization, requiring an NCO to escort Pernell at all times while on Fort Bragg, and requiring that Pernell's CQ observe Pernell every two hours while Pernell was confined to barracks. Pl.'s Mem. Opp'n Mot. Dismiss 3–4; see Compl. ¶ 18; Pernell Aff. ¶¶ 10–11.

Durden contends that by issuing these valid orders, the government had the capacity to control Pernell. See Compl. ¶¶ 18–20.

The government denies Durden's allegations regarding the scope of the restrictions that it placed on Pernell. See Def.'s Mem. Supp. Mot. Dismiss 4–7. The government concedes that, when Pernell returned to Fort Bragg following his September 2009 arrest, it "revoked [Pernell's] leave and pass privileges, which in effect restricted [Pernell] to the limits of Fort Bragg." Id. 5; see Wiltse Decl. ¶ 6. However, between October 22, 2009 and December 13, 2009, Pernell was not required to have an escort when he was on Fort Bragg. See Wiltse Decl. ¶¶ 6–7. Moreover, the government specifically denies that Wiltse, on behalf of the government, ordered Pernell's CQ to frequently observe Pernell. Def.'s Mem. Supp. Mot. Dismiss 6; see Wiltse Decl. ¶ 9. The government contends that had it taken any measures against Pernell in response to Pernell's being charged with state criminal offenses, such measures would have amounted to punitive restraint or confinement, and that, between October 22, 2009 and December 13, 2009, the government did not have authority under the UCMJ to so restrain or confine Pernell. Def.'s Mem. Supp. Mot. Dismiss 7 & n.2; see Wiltse Decl. ¶ 7; see also United States v. Smith, 20 M.J. 528, 531–32 (A.C.M.R. 1985); Manual for Courts-Martial, Rule for Courts-Martial 304(a).

The evidence shows that the government did not have the capacity to control Pernell before December 13, 2009. Durden's argument to the contrary relies exclusively on Pernell's ipse dixit. Pernell, in turn, offers no support for his sworn statements. However, the government rebuts Pernell's sworn statements with sworn statements of government employees that are supported by documentary evidence. For example, Wiltse's statement that the government, acting through Wiltse, did not restrict Pernell's ability to move freely about Fort Bragg is supported by the October 22, 2009 Counseling Form's omitting any such restrictions. See October 22, 2009 Counseling Form 1–2.

Pernell's and Wiltse's statements suggest that if the government had so restricted Pernell, such a restriction would have been acknowledged in the October 22, 2009 Counseling Form. Moreover, Durden offers nothing to rebut the government's contention that the government would have violated the UCMJ had it imposed on Pernell the restrictions that Pernell claims that the government imposed on him. Accordingly, the evidence demonstrates that the government only was able to control Pernell's movements off Fort Bragg, and that the government was not able to control Pernell's movements on Fort Bragg. Thus, the government lacked the ability to control Pernell in such a way that it could have prevented Pernell from causing Durden's injuries. See King, 113 N.C. App. at 346–47, 439 S.E.2d at 775.

C.

Finally, Durden contends that, on October 22, 2009, the government voluntarily undertook the tasks of preventing Pernell from committing additional crimes off and on Fort Bragg. See Compl. ¶¶ 13–15, 24(b). Durden argues that when the government undertook the task of preventing Pernell from committing crimes on Fort Bragg, it assumed a duty under North Carolina law to protect third parties who were likely to be injured by crimes that Pernell might commit if the government negligently performed its voluntarily-assumed task. See id.; see also Pl.'s Mem. Opp'n Mot. Dismiss 6. Durden then argues that, as a resident of Fort Bragg, she was a third party to whom the government owed a duty, and that such a duty was independent of Pernell's employment status. See Compl. ¶ 21; Pl.'s Mem. Opp'n Mot. Dismiss 6.

"[U]nder certain circumstances, one who undertakes to render services to another which he should recognize as necessary for the protection of a third person, or his property, is subject to liability to the third person, for injuries resulting from his failure to exercise reasonable care in such undertaking." Edwards v. GE Lighting Sys., Inc., 200 N.C. App. 754, 758, 685 S.E.2d 146, 149

20

(2009) (quotation omitted); see Quail Hollow E. Condo. Ass'n v. Donald J. Scholz Co., 47 N.C. App. 518, 522, 268 S.E.2d 12, 15 (1980). This principle is referred to as the "Good Samaritan Doctrine." Edwards, 200 N.C. App. at 758, 685 S.E.2d at 149. "The duty to protect others from harm arises whenever one person is . . . placed in such a position towards another that anyone of ordinary sense who thinks will . . . recognize that if he does not use ordinary care and skill in his own conduct . . . , he will cause danger of injury to the person or property of the other." Davidson & Jones, Inc. v. Cnty. of New Hanover, 41 N.C. App. 661, 666, 255 S.E.2d 580, 584 (1979). Such a duty is triggered whenever "a party [places] himself in a position where his affirmative conduct may be expected to affect the interest of another person." Ingle v. Allen, 71 N.C. App. 20, 27, 321 S.E.2d 588, 594 (1984), overruled on other grounds by Dep't of Transp. v. Rowe, 351 N.C. 172, 521 S.E.2d 707 (1999).

In Sheridan II, the Fourth Circuit considered whether plaintiffs' alleged facts established that the government owed plaintiffs a duty under Maryland's Good Samaritan Doctrine. See Sheridan II, 969 F.2d at 74–75. Maryland's and North Carolina's versions of the Good Samaritan Doctrine are materially indistinguishable. Compare E.G. Rock, Inc. v. Danly, 98 Md. App. 411, 423–24, 633 A.2d 485, 491 (1993), with Edwards, 200 N.C. App. at 758, 685 S.E.2d at 149. The Sheridan II plaintiffs alleged that the government, by issuing orders prohibiting firearms on base and requiring government employees to report disciplinary infractions, voluntarily assumed a duty to individuals likely to be harmed by a government employee's failure to follow those orders. Sheridan II, 969 F.2d at 74–75. Applying Maryland law, the Fourth Circuit rejected this argument, holding that "[p]laintiffs suffered no greater risk of harm on the streets surrounding [the hospital] from a serviceman such as [the assailant] because of the gratuitous promulgation of the regulations and their

21

breach than if the [government] had never promulgated such regulations in the first instance." Id. at 74–75.

As in Sheridan II, Durden contends that the government, by issuing orders restraining Pernell's liberty, voluntarily assumed a duty to protect individuals likely to be harmed if Pernell went unrestrained. However, Durden does not demonstrate how the government's assuming the task of restraining Pernell's liberty and then failing to perform that task made it more likely that Pernell would harm her than if the government had not attempted to restrain Pernell's liberty in the first place. See id. Accordingly, accepting as true Durden's allegations regarding the government's efforts to restrain Pernell, these allegations do not establish the existence a duty owed by the government to Durden under North Carolina's version of the Good Samaritan Doctrine. See id.

Alternatively, even if Durden could establish that the government's attempts to restrain Pernell gave rise to a duty to protect her under North Carolina law, such a duty would not be independent of Pernell's employment status. See Bajkowski, 787 F. Supp. at 541–42. As discussed, the government's ability to restrain Pernell stemmed solely from Pernell's being a government employee. Sheridan II, 969 F.2d at 75. Thus, the claim fails.

III.

The court lacks subject matter jurisdiction. Accordingly, the court GRANTS the government's motion to dismiss under Rule 12(b)(1) [D.E. 13] and dismisses the case.

SO ORDERED. This **31** day of August 2012.

JAMES C. DEVER III
Chief United States District Judge